UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

RAYMOND GONZALEZ,

                       Plaintiff,

           v.

CAROLYN COLVIN,
*Acting Commissioner of Social Security*,

                Defendant.

------------------------------------------------------ X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>November 16, 2016</u> |

15 Civ. 5011 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

Plaintiff Raymond Gonzalez ("Plaintiff") filed this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision by the Acting Commissioner of Social Security (the "Commissioner" or "Defendant") that denied Plaintiff's applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties have filed cross-motions for judgment on the pleadings. For the reasons set forth in the remainder of this Opinion, Plaintiff's motion is denied and Defendant's motion is granted.

## BACKGROUND[1]

Plaintiff filed applications for DIB and SSI on March 27, 2012, alleging that he has been disabled since December 2, 2006.  (SSA Rec. 78, 91, 101-02, 211-18).[2]  The Commissioner denied Plaintiff's applications on July 6, 2012, and Plaintiff timely requested a hearing before an Administrative Law Judge (the "ALJ"), pursuant to 20 C.F.R. §§ 404.929 and 416.1429.  (*Id.* at 12, 101-11).  Plaintiff appeared with counsel and testified at three hearings before ALJ Sean P. Walsh on October 2, 2013; January 24, 2014; and March 7, 2014.  (*Id.* at 29-77).[3]  On March 28, 2014, ALJ Walsh issued his decision finding Plaintiff ineligible for both DIB and SSI benefits.  (*Id.* at 9-23).

On May 20, 2014, Plaintiff timely requested that the Appeals Council review ALJ Walsh's decision.  (SSA Rec. 7-8).  The Appeals Council denied Plaintiff's request on April 24, 2015, rendering ALJ Walsh's decision the Commissioner's final decision in Plaintiff's case.  (*Id.* at 1-4).

---

[1]  The facts in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #13), which was filed by the Commissioner on January 27, 2016.  For convenience, Defendant's supporting memorandum (Dkt. #15) is referred to as "Def. Br.," Plaintiff's supporting memorandum (Dkt. #17) is referred to as "Pl. Br.," Defendant's reply memorandum (Dkt. #18) as "Def. Reply," and Plaintiff's reply memorandum (Dkt. #19) as "Pl. Reply."

[2]  In the Application Summary developed with regard to Plaintiff's application for Supplemental Security Income, Plaintiff reported an onset date of December 2, 2002. (SSA Rec. 213).  The Court presumes this was simply a typographical error; the alleged onset date of December 2, 2006, has not been disputed by either party.

[3]  The Court notes that Plaintiff did not appear for his first hearing on May 16, 2013, when it was originally scheduled.  (SSA Rec. 122-49).  Plaintiff explained that he was unable to appear because his child required treatment for a bacterial infection; this explanation was supported by Plaintiff's provision of a doctor's note from the North Central Bronx Hospital Pediatric Emergency Department.  (*Id.* at 300-01).  The hearing was accordingly rescheduled for October 2, 2013.  (*Id.* at 157-63).  Plaintiff retained counsel on July 12, 2013.  (*Id.* at 165-66).

**A.      Plaintiff's Occupational History**

Plaintiff indicated in his Disability Report that he could not remember all of his employers' identities, his dates of employment, or his rates of pay.  (SSA Rec. 262).  He reported though that from 1992 to 1993, in 1996, and in 2003, he worked as a messenger for a messenger service.  (*Id.* at 88, 255, 265).  In 1997, Plaintiff also worked as a porter in an office building.  (*Id.*).  From 1999 to 2003 or 2005, Plaintiff worked as a mail room clerk for a law firm.  (*Id.*).  In 1994, 1995, 2002, and 2005, Plaintiff worked as a stock clerk in a department store.  (*Id.* at 88-89, 255, 265).  Finally, Plaintiff worked in security from 2002 to 2003.  (*Id.* at 89, 255, 265).

After the onset of Plaintiff's disability in 2006, for three weeks in 2008, Plaintiff worked binding books at Copycats.  (SSA Rec. 243, 248).  In 2007 and from 2009 to 2012, Plaintiff reported that he did not work "on the books," though he did work.  (*Id.* at 212).  Beginning on August 5, 2011, Plaintiff worked assisting Luis Hernandez with furniture delivery.  (*Id.* at 210).  Plaintiff worked up to five days or 32 hours per week and was paid at a rate of $5.15 per hour.  (*Id.* at 210, 262).  Plaintiff indicated that he performed this work from 2011 to 2012.  (*Id.* at 265).  In describing what he did at this job, Plaintiff explained that he "assisted driver in making deliveries."  (*Id.* at 271).  Specifically with regard to lifting and carrying, he elaborated that he "[l]ifted furniture with assistance to more tha[n] 4 locations throughout different states (refrigerators, washers, dryers, stoves, etc.)."  (*Id.*).  The heaviest weight he lifted was 100 pounds or more; Plaintiff frequently was required to lift 50

pounds or more.  (*Id*.).  On one occasion, though, Plaintiff noted that his

employer at this job told Plaintiff that "[the employer] may have to let [Plaintiff]

go because [he could not] lift the furniture or appliances [the company had] to

deliver."  (*Id.* at 248).  When Plaintiff visited the Behavioral Health Center of

Metropolitan Hospital Center on April 18, 2012 — as is discussed in more

depth below — Plaintiff indicated that he "work[ed] unloading trucks."  (*Id.* at

363).

**B.**     **Plaintiff's Medical History**

 **1.**     **Plaintiff's Mental Health History**

  On April 2, 2009, Plaintiff was taken by ambulance to the Weiler Hospital

Emergency Room because he was experiencing pain in the left side of his body.

(SSA Rec. 355).  His only specified prior medical condition was asthma.  (*Id.* at

355, 357).  Plaintiff reported feeling anxious, nervous, and stressed due to

family and legal issues.  (*Id.* at 356).  Plaintiff was experiencing chest

palpitations.  (*Id*.).  He was diagnosed with an anxiety / panic attack.  (*Id.* at

358-59).

  On August 29, 2011, Plaintiff presented at the Emergency Department of

Metropolitan Hospital Center because he felt anxious, nervous, and nauseous;

was unable to sleep; had lost weight; and wished to see a doctor.  (SSA

Rec. 373-74).  Registered Nurse Janice Buchanan noted that Plaintiff was in

need of social services.  (*Id.* at 373).  Plaintiff also complained of an itchy skin

rash on his hands.  (*Id.* at 374).  He was referred for psychiatric and

dermatologic exams with regard to his anxiety and rash.  (*Id.* at 375).

On April 18, 2012, Plaintiff was seen at the Behavioral Health Center of Metropolitan Hospital Center for a psychiatric evaluation pursuant to a referral from the Hospital's Emergency Department.  (SSA Rec. 363).  Plaintiff's condition was evaluated by Registered Nurse Charles Mighty and clinician Dr. Laurence Dopkin.  (*Id.* at 364-65, 369).  Plaintiff mentioned that he had a history of asthma.  (*Id.* at 365).  He indicated that he had no prior history of psychiatric problems, but explained that he had started having trouble sleeping and feeling scared when he moved into a shelter, where he said security harassed him and his wife and some things had been stolen from him.  (*Id.* at 363).  Plaintiff stated that "he [would wake] up in the middle of the night and [was] scared something [would] happen to his family," and that he had to take Tylenol PM to help him sleep.  (*Id.*).  He was diagnosed with an adjustment disorder with mixed emotions / anxiety and depressed mood.  (*Id.* at 364).

### 2. Plaintiff's Physical Health History

#### a. Plaintiff's Pre-Onset Medical Treatment

On July 20, 2001, "painful hardware" was surgically removed from Plaintiff's right ankle at St. Luke's-Roosevelt Hospital.  (SSA Rec. 326-51, 506-29).  Specifically, two syndesmotic screws and one metal pin were removed.  (*Id.* at 346, 349, 506, 508).  Plaintiff's history of asthma was noted in the treatment notes of his surgeon and anesthesiologist at this time.  (*Id.* at 327, 331).  On August 24, 2004, because Plaintiff reported abdominal pain, he was examined in the Radiology Department of Metropolitan Hospital Center.  (*Id.* at 390-91).  The examination ruled out a possible urinary stone.  (*Id.*).

### b.     Plaintiff's Post-Onset Medical Treatment

On November 30, 2007, Plaintiff presented to the Emergency Department of North Central Bronx Hospital and was diagnosed with an acute upper respiratory infection.  (SSA Rec. 463).  He was discharged without the performance of any procedures.  (*Id.*).  On February 10, 2008, Plaintiff presented to the same emergency department with an "[u]nspecified disorder of the teeth and supporting structures."  (*Id.*).

On June 8, 2008, Plaintiff was diagnosed in the Department of Radiology at North Central Bronx Hospital with a comminuted interarticular calcaneal fracture of his left heel.  (SSA Rec. 440-46).  A laceration on Plaintiff's left wrist, which Plaintiff indicated had been caused by a "punch through glass" (*id.* at 447), was also examined.  No evidence of fracture or dislocation was found. (*Id.*).  Plaintiff returned for a six-week follow-up appointment on July 18, 2008. (*Id.* at 464, 470).  On October 27, 2008, Plaintiff returned to the Jacobi Medical Center for an interval cast removal.  (*Id.* at 438).  On November 24, 2008, he was examined by physicians in the Departments of Radiology and Orthopedics, who found that Plaintiff's left heel calcaneus fracture was healing or healed. (*Id.* at 436, 465, 471).  Plaintiff complained of pain with ambulation, and was given a subtalar injection of the corticosteroid Depo-medrol for any subtalar arthritis.  (*Id.* at 465, 471).

On August 20, 2009, Plaintiff returned to the Emergency Department of North Central Bronx Hospital.  (SSA Rec. 466).  He was again diagnosed with an acute upper respiratory infection and discharged.  (*Id.*).

On May 17, 2010, Plaintiff was taken on a stretcher by EMS transport from Rikers Island Prison to Elmhurst Hospital Center. (SSA Rec. 393). Plaintiff explained that he had been physically assaulted by another inmate, who had struck Plaintiff in the face and head multiple times with an unknown object. (*Id.* at 393, 416). Plaintiff was reported to have bruising, discoloration, and swelling on or around his left eye, but a calm, relaxed, and coherent demeanor. (*Id.*). There was blood on Plaintiff's teeth and tongue but no visible source of oral bleeding. (*Id.* at 397). Plaintiff complained of a head injury, loss of consciousness, a headache, eye pain, eye and face swelling, and nausea. (*Id.* at 396). His pertinent medical history was a history of asthma, for which he was then taking the bronchodilator Albuterol. (*Id.* at 393-94). Computerized axial tomographic scans ("CT scans") of Plaintiff's face and head indicated a fracture of Plaintiff's left orbit and zygomatic arch. (*Id.* at 406-07). Plaintiff had a scalp wound five centimeters in length that was closed with eight sutures using staples. (*Id.* at 410). Plaintiff was prescribed the pain medication Percocet, the antibiotic Keflex, Afrin nasal spray, and Sudafed. (*Id.* at 399). He was then discharged back to Rikers Island. (*Id.* at 410).

Two days later, on May 19, 2010, Plaintiff presented to the Emergency Department of Metropolitan Hospital Center complaining of a cough, facial pain, pain in both ears, and a periorbital bruise resulting from the aforementioned assault. (SSA Rec. 370). Plaintiff was experiencing wheezing and chest tightness. (*Id.* at 371). Plaintiff stated that he had a history of asthma and was an occasional smoker. (*Id.*). Films of Plaintiff's chest read by

7

Dr. Soodabeh Haeri in the Radiology Department revealed no evidence of disease.  (*Id.* at 389).

On December 25, 2011, Plaintiff went to the Emergency Department of the Elmhurst Hospital Center for treatment of moderate ear pain that he had been experiencing for a week.  (SSA Rec. 423).  His ear was treated with the antibacterial and anti-inflammatory Cortisporin.  (*Id.* at 424).  Plaintiff was found to be otherwise well and discharged to home.  (*Id.* at 424-25).

On February 14, 2012, Plaintiff again visited the Emergency Department of the Elmhurst Hospital Center.  (SSA Rec. 428).  He complained of pain and a mass in his left armpit.  (*Id.*).  Plaintiff reported that he had "had a similar abscess in the past to his leg" and a past dental abscess.  (*Id.* at 432).  Plaintiff also complained of residual pain in his left front tooth from a past fight, which had come to cause pain to his upper lip and face.  (*Id.*).  Dr. Amanda Holland drained Plaintiff's abscess.  (*Id.* at 431).  Plaintiff was directed to take Ibuprofen and Penicillin, and discharged to home.  (*Id.* at 430, 432).

On April 12, 2012, Plaintiff was seen by the Emergency Department at North Central Bronx Hospital for pain that had persisted since Plaintiff fractured his left ankle.  (SSA Rec. 449, 452, 467).  Plaintiff had slight swelling in his left outer ankle, was limping, and was experiencing numbness in his left thigh.  (*Id.* 452).  He additionally reported urethral discharge.  (*Id.* at 454).

On April 13, 2012, Plaintiff was examined by the Department of Radiology.  (SSA Rec. 435).  Dr. Hilary Umans read Plaintiff's X-rays, which she found showed "regions of increased sclerosis, consistent with [an] old healed

fracture." (*Id.*).  Dr. Umans also noted the presence of "small dorsal and plantar calcaneal spurs," but noted that there was "no visible acute fracture." (*Id.*).  Plaintiff was referred for follow-up podiatry and orthopedic appointments. (*Id.* at 449, 468-69, 488).

Patient visited the Orthopedics Department on May 16, 2012, and was seen by Doctor of Podiatric Medicine Shashonna J. Dupree.  (SSA Rec. 483). Plaintiff reported having had pain in both of his ankles for multiple years.  (*Id.*). He said that this pain worsened since he stopped physical therapy for it two years prior to his appointment.  (*Id.*).  Plaintiff states that he took Naproxen for his pain, which worsened "after periods of prolonged ambulation."  (*Id.*). Plaintiff was given an injection of Depo-medrol, directed to return for a follow-up appointment with podiatry, and referred for physical therapy.  (*Id.* at 483-87).

On June 23, 2013, Plaintiff reported to the Emergency Department of North Central Bronx Hospital.  (SSA Rec. 539).  Plaintiff presented with "[u]nspecified chest pain" and "left rib pain," which he claimed resulted from an assault.  (*Id.* at 539-40).  Plaintiff was examined; found not to have a fracture to his jaw, chest, or rib; and discharged.  (*Id.*).

On July 3, 2013, Plaintiff was referred by Physician Assistant ("PA") Kristin S. Marsigliano for physical therapy and a rehabilitation consult.  (SSA Rec. 537).  Plaintiff indicated that he was also given a steroid injection for his foot pain.  (*Id.* at 302).  He reported receiving other injections on August 6, 2013, and September 3, 2013.  (*Id.* at 303-04).

On August 9, 2013, Plaintiff was referred by the Rehabilitation Clinic to the Prosthetic and Orthotic Clinic for an evaluation for shoe modification.  (SSA Rec. 538).  On September 10, 2013, Plaintiff was seen by the Podiatry Clinic at North Central Bronx Hospital.  (*Id.* at 536).  He claimed to be suffering from lateral sensation loss in his left foot.  (*Id.*).  He was noted to have traumatic arthopathy and referred to orthopedics for a reevaluation.  (*Id.*).

On November 27, 2013, PA Marsigliano again referred plaintiff for pain management and rehabilitation consults.  (SSA Rec. 544-46).  Plaintiff was scheduled for two rehabilitation appointments, on December 31, 2013, and on February 11, 2014.  (*Id.* at 549).  Presumably pursuant to the former appointment, on December 31, 2013, Dr. Sunil Thomas from North Central Bronx Hospital issued Plaintiff prescriptions for Gabapentin[4] and a straight cane.  (*Id.* at 307-08).

On December 8, 2013, Plaintiff presented at the Emergency Department of North Central Bronx Hospital, complaining of ankle pain.  (SSA Rec. 547).  He was discharged and directed to take Motrin for his pain.  (*Id.*).  Dr. Surya Yalla also prescribed Ibuprofen and Ranitidine.[5]  (*Id.* at 308-09).

On January 5, 2014, Plaintiff was seen by the Mount Sinai Hospital Emergency Department for an asthma flare.  (SSA Rec. 550-52).  He was

---

[4]     Gabapentin is an anticonvulsant that is used to control certain types of seizures in people who have epilepsy and to relieve pain caused by postherpetic neuralgia.

[5]     Ranitidine is an H2 blocker that is used to treat ulcers, gastroesophageal reflux disease, and other conditions involving or causing the overproduction of stomach acid.  Plaintiff testified that acid reflux was a side effect of his pain medication.  (SSA Rec. 63).

prescribed the bronchodilator albuterol sulfate and the corticosteroid Prednisone and directed to follow up in three days with a primary care physician.  (*Id.*).

On July 13, 2014, Plaintiff presented at the Emergency Department at North Central Bronx Hospital.  (SSA Rec. 534).  He was treated for injuring his elbow and ankle and hitting his head when he accidentally fell down stairs. (*Id.*).  X-rays were taken and Plaintiff was discharged with a prescription for pain medication.  (*Id.*).

### 3.    Treating Opinion of Physician Assistant Marsigliano

On July 3, 2013, and September 23, 2013, PA Marsigliano offered her opinion with regard to Plaintiff's medical history and then-present condition. (SSA Rec. 532-33).  She noted that Plaintiff had suffered a left calcaneal fracture in June 2008, for which he "was treated conservatively in a cast."  (*Id.* at 532).  A podiatrist gave Plaintiff an injection in 2012 to treat his continued pain, of which Plaintiff continued to complain through 2013.  (*Id.*).  Plaintiff was given referrals to pain management and physical therapy.  (*Id.*).  PA Marsigliano elaborated that Plaintiff "suffer[ed] from traumatic arthopathy, a joint disease[] caused by trauma, characterized by a fracture line through the joint," which caused him to "experienc[e] lateral sensation loss in his left foot." (*Id.* at 533).  She described Plaintiff's symptoms at length:

> [Plaintiff] suffers from constant pain in his fibula bone. He is unable to keep his balance without the use of a cane.  This does not allow him to sit or stand for long periods of time and [he] would need to alternate frequently if need so.  He cannot push or pull objects

over 10 pounds.  He cannot stoop or bend as it will hurt his hips due to the arthropathy as seen in treating [Plaintiff].  I have noted he is unable to follow written direction.  He cannot remember simple frequencies as he becomes overwhelmed and stress due to pain endurance leaving him unable to concentrate.  Frequent steroid injection shots are a common treatment, but [Plaintiff] is exhibiting side effects such as anxiety, insomnia, and dizziness with trouble concentrating. ... [Plaintiff's] ability to perform a number of basic tasks is limited.

(*Id.*).  PA Marsigliano accordingly stated that she believed that Plaintiff should

be considered disabled.  (*Id.*).  With regard to the inhibition of Plaintiff's ability

to work, PA Marsigliano stated that Plaintiff was "[u]nable to sit or stand for

long periods of time, cannot balance without use of a cane, unable to bend,

stoop, or reach overhead, need[s] frequent breaks, unable to concentrate,

cannot follow or remember simple instructions."  (*Id.*).  With regard to the

inhibition of Plaintiff's overall mobility, PA Marsigliano reiterated that Plaintiff

was "[u]nable to stand or sit for long periods of time, cannot lift, pull, push,

bend, stoop, or reach overhead, [and] cannot perform routine tasks as he

cannot remember sequences due [to] anxiety."  (*Id.*).

### 4. Consultative Evaluations Undertaken in Conjunction with Plaintiff's DIB and SSI Applications

On April 9, 2012, Plaintiff was interviewed by D. Rodriguez at the SSA

field office.  (SSA Rec. 250-52).[6]  Plaintiff was not observed to have difficulties

hearing, reading, breathing, understanding, communicating coherently,

---

[6]     In the administrative record, there are several documents in which an individual's first name is signified only by an initial.  For those instances, the Court will list only the initial.

concentrating, talking, answering, sitting, standing, walking, using hand(s), or writing.  (*Id.* at 251).  Rodriguez noted that Plaintiff, "[t]alked, sat, stood up without difficulties," and was "[v]ery friendly."  (*Id.* at 252).

On May 18, 2012, psychologist Arlene Broska, Ph.D., performed a psychiatric evaluation of Plaintiff.  (SSA Rec. 492).  Dr. Broska reported that Plaintiff had traveled to his appointment alone by taxi.  (*Id.*).  Plaintiff had last worked three years prior, in a mailroom, but "was fired because he missed too many days due to asthma." (*Id.*).  Plaintiff described his 2011 visit to Metropolitan Hospital, where he was seen for depression because he "was living in a shelter and ... had a lot of anxiety and was not able to sleep." (*Id.*). Plaintiff reported that he had been to the hospital for asthma, and twice for surgery, once on each of his legs.  (*Id.*).  He identified his current medical conditions as bilateral leg problems, pain, and asthma, and his current medications as the bronchodilator Ventolin, naproxen, and steroid injections. (*Id.*).  In describing his current psychiatric functioning, Plaintiff claimed that he had "some difficulty falling asleep," was "not able to do things that he used to do," got "offended easily," and sometimes found it "hard to comprehend things." (*Id.*).  Plaintiff reported a criminal history including two felony arrests for gun possession and 24 misdemeanor arrests.  (*Id.* at 493).

Dr. Broska performed a mental status examination and found the following:

> [Plaintiff's] demeanor and responsiveness to questions was cooperative.  His manner of relating, social skills, and overall presentation were adequate. ... [Plaintiff]

> appeared to be his stated age.  He was casually dressed
> and well groomed.  He used a cane.  Posture and motor
> behavior were normal.  Eye contact was appropriate. ...
> Speech intelligibility was fluent.  The quality of voice
> was clear.  Expressive and receptive language abilities
> were adequate. ... [Plaintiff's] thinking was coherent and
> goal directed with no evidence of hallucinations,
> delusions, or paranoia in the evaluation setting.
> ... [Plaintiff's affect was] of full range and appropriate in
> speech and thought content. ... [Plaintiff] could
> maintain attention and concentration throughout the
> evaluation.  He could do counting, simple calculations,
> and count forward by three. ... [Plaintiff's] level of
> intellectual functioning is estimated to be below average
> with general fund of information appropriate to his
> experience.

(SSA Rec. 493-94).  Plaintiff had a neutral mood, clear sensorium, fair insight, and fair to poor judgment.  (*Id.* at 494).  With regard to Plaintiff's mode of living, Dr. Broska noted that Plaintiff could dress, bathe, groom himself, use a microwave, shop, use public transportation independently, socialize, watch TV, read, and listen to the radio.  (*Id.*).  Vocationally, she determined that Plaintiff could understand and follow simple directions; perform simple and complex tasks on his own; maintain attention and concentration; maintain a regular schedule; and relate adequately to others.  (*Id.*).  She also noted, however, that Plaintiff "may not always deal appropriately with stress."  (*Id.*).  Dr. Broska concluded that the results of her examination did "not appear to be consistent with any psychiatric problems that significantly interfere with [Plaintiff's] ability to function on a daily basis."  (*Id.*).  Plaintiff was given no Axis I diagnosis, an

Axis II diagnosis of anti-social traits, and an Axis III diagnosis of asthma and bilateral leg problems and pain.  (*Id.* at 495).[7]

Also on May 18, 2012, Dr. Marilee Mescon performed an internal medicine examination of Plaintiff.  (SSA Rec. 496).  Plaintiff's chief complaint was right wrist trauma that he attributed to a fall at age 18 in an attempt to climb a fence.  (*Id.*).  Plaintiff chipped his bones in his right wrist and was "admitted to Lenox Hill Hospital for surgical intervention." (*Id.*).  Plaintiff had residual sharp pain and stiffness that impeded his use of his right hand.  (*See id.*).  Additionally, Plaintiff reported falling and fracturing his right fibula and right ankle roughly 10 years prior to Dr. Mescon's examination.  (*Id.*).  Plaintiff's ankle fracture "required open reduction, internal fixation" and, most recently, an injection of Cortisone one day before Dr. Mescon's examination. (*Id.*).  Roughly two or three years before the examination, Plaintiff fell again, down a flight of stairs, and injured his left heel and left ankle.  (*Id.*).

Plaintiff reported that he had had asthma since childhood, suffered from three asthma attacks in 2010 and 2011, and used home nebulizers and

---

[7]     *See generally Santiago* v. *Colvin*, No. 12 Civ. 7052 (GBD) (FM), 2014 WL 718424, at *4 n.6 (S.D.N.Y. Feb. 25, 2014), *report and recommendation adopted*, No. 12 Civ. 7052 (GBD) (FM), 2014 WL 1092967 (S.D.N.Y. Mar. 17, 2014):

> "Axis I" and "Axis II" refer to categories in the DSM's [Diagnostic and Statistical Manual of Mental Disorders's] multiaxial system of assessment.  This system was introduced in the third edition of the DSM in 1980, and was designed to help clinicians plan treatment and predict outcomes.  *See* DSM-IV-TR at 27.  It was dropped in favor of a nonaxial system in the DSM-5.  DSM-5 at 16. Under the now-outdated multiaxial system, Axis II included personality disorders and mental retardation, and Axis I included all other psychological disorders and conditions that may be a focus of clinical attention.  DSM-IV-TR at 28-29.

bronchodilators.  (SSA Rec. 497).  He reported that his asthma was worsened by cold weather, respiratory tract infections, and exertion.  (*Id*.).  Plaintiff smoked up to one pack of cigarettes a day since he was 16 years old.  (*Id*.). Plaintiff also began using marijuana at that time, and was "vague and nonspecific" at the examination "as to how long he ha[d] been using the marijuana."  (*Id*.).  Dr. Mescon's findings regarding Plaintiff's daily living matched Dr. Broska's.  (*See id*.).

Dr. Mescon reported that Plaintiff did not appear to be in acute distress. (SSA Rec. 497).  He "[c]ould not walk on heels in toes of the left foot," and sometimes "[u]sed a cane because of pain in both of his legs," as was prescribed by his doctor, but his squat was full and his stance normal.  (*Id*.). Plaintiff's cane was "not medically necessary for him to ambulate," and he had no difficulty changing for his exam, getting on or off the exam table, or getting up from his chair.  (*Id*. at 497-98).  None of Plaintiff's body systems was deemed abnormal, though Plaintiff had diminished sensation in his left thigh and slightly diminished motor strength in his left leg.  (*Id*. at 498-99).  In her medical source statement, Dr. Mescon concluded that,

> [o]n the basis of the examination, there are no limitations in [Plaintiff's] ability to sit or stand.  His capacity to climb, push, pull, and carry heavy objects would be moderately to severely limited because of a previous right wrist injury with restriction of [range of motion] and because of bilateral ankle trauma.  Since [Plaintiff] has a history of asthma, environments where there are toxic dust, chemicals or fumes are not recommended.

(*Id*. at 499-500).

16

On May 2, 2012, Plaintiff was evaluated by Disability Analyst Carla Choynowski and found not to exhibit more than a slight abnormality in any mental functions. (SSA Rec. 289). Choynowski noted that despite Plaintiff's alleged anxiety and PTSD, there was no evidence of psychiatric hospitalizations, outpatient psychiatric treatment, or psychiatric medications. (*Id.*). She noted that Plaintiff had been arrested twice for felony gun possession and 24 times for misdemeanors, and stated accordingly, "Plaintiff does not always make good decisions." (*Id.*). Choynowski also recounted Plaintiff's reported daily activities and found that his "allegations are partially credible, as they are supported by evidence in file, but not to the degree alleged." (*Id.*). She concluded that Plaintiff had "no psychiatric limitations to vocational functioning." (*Id.*).

Choynowski referred Plaintiff's case to state agency psychiatrist Tammy Inman-Dundon for a review of the psychiatric findings therein on May 30, 2012, and Dr. Inman-Dundon "[a]gree[d] with a non-severe assessment." (SSA Rec. 501). On May 31, 2012, and June 29, 2012, Dr. Inman-Dundon applied and then documented her performance of the special psychiatric review technique with regard to Plaintiff's medically determinable impairments, their severity, and their impact on Plaintiff's functioning. (*Id.* at 85, 98). She evaluated Plaintiff's alleged personality disorders and found that he had no restriction of activities of daily living; mild difficulties in maintaining social

functioning; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. (*Id.*).

## C.    Plaintiff's Administrative Hearings

### 1.    The October 2, 2013 Hearing

On October 2, 2013, Plaintiff appeared with counsel for his administrative hearing before Administrative Law Judge Sean P. Walsh. (SSA Rec. 69). Plaintiff testified that he was 34 years old and had attended school through grade 10. (*Id.* at 70). He explained that he was let go from his most recent job as a mailroom clerk at a law firm because he "missed a lot of days because of [his] pain." (*Id.*). Prior to that position, Plaintiff indicated that he had worked as a messenger on foot and as a security guard. (*Id.* at 71).

ALJ Walsh then discussed Plaintiff's health history with him. Plaintiff answered affirmatively when asked if, on or about December 2, 2006, he had fallen down stairs, broken his ankle, and hurt his elbow. (SSA Rec. 71). He agreed that he had been taken to North Central Bronx Hospital, and that he had since been receiving continuous therapy there, including steroid injections, Ibuprofen, and muscle relaxers. (*Id.*). Plaintiff also testified that he was receiving physical therapy on a weekly basis. (*Id.* at 73). Plaintiff noted that his fracture had not healed, that he could not flex his left ankle at all, and that he had a brace. (*Id.* at 72). Plaintiff affirmed his therapist's reports that he was in constant pain; unable to stand or sit for significant periods of time; incapable of lifting 10 pounds; and had difficulty bending or stooping, walking, and climbing stairs without pain. (*Id.* at 74-75). Plaintiff noted that he had

18

fallen down the stairs roughly two months prior to the hearing because of weakness in his joints and poor balance.  (*Id.* at 75).

Plaintiff also discussed several other injuries with ALJ Walsh.  He claimed to have chipped a bone in his right wrist at age 18; indicated that he had left elbow pain; and said that since 2001, he had had two operations involving his right leg, during which two screws and a rod were placed inside his femur.  (SSA Rec. 73-74).  As of the hearing date, Plaintiff used a cane to walk.  (*Id.* at 74).  Plaintiff also described experiencing and receiving treatment for anxiety after his accident.  (*Id.* at 74).  When testimony concluded, ALJ Walsh indicated that he would issue a fully favorable decision.  (*Id.* at 76).

### 2.    The January 24, 2014 Hearing

On January 24, 2014, Plaintiff returned for a second administrative hearing before ALJ Walsh.  (SSA Rec. 54).  ALJ Walsh explained that he had "rescheduled this [hearing] because [he had] issued a fully favorable opinion and it was reported to [him] by the payment center that [Plaintiff's] onset date of December 2, 2006, was complicated by after onset earnings."  (*Id.* at 54).[8] Upon reviewing the earnings issues that had been flagged for his review, ALJ Walsh concluded that Plaintiff's post-onset earnings were not an issue because they did not rise to the substantial gainful activity level.  (*Id.* at 58).  ALJ Walsh also discussed with Plaintiff the furniture delivery work that gave rise to these earnings, as well as Plaintiff's reported ailments, in an apparent effort to

---

[8]      Plaintiff indicated that he had not received the decision, so the ALJ concluded it had not actually been issued.  (SSA Rec. 55).

reconcile the two.  (*Id.* at 58-65).  Plaintiff described having had, over the course of his life, fractures in both legs, a fracture to the left side of his face, and fractures in each of his wrists.  (*Id.*).  ALJ Walsh concluded the hearing when he found that he had "all the information [he] need[ed] to issue a fully favorable opinion at this time at step five."  (*Id.* at 65).

### 3.   The March 7, 2014 Hearing

On March 7, 2014, Plaintiff again appeared before ALJ Walsh for an administrative hearing, which ALJ Walsh had called "to explore a couple issues based upon documents that ha[d] been brought to [his] attention that previously [he] had been unaware of[,] [a]nd which [he was] reasonably persuaded the Appeals Council would note even though [he] didn't until too late in the game." (SSA Rec. 31).  Again, ALJ Walsh revisited the delivery work that Plaintiff performed in 2011 and 2012.  (*Id.* at 32).  ALJ Walsh noted that he had overlooked the portion of Plaintiff's work history report where Plaintiff explained that he lifted and delivered furniture up to 100 pounds in weight and frequently of around 50 pounds in weight.  (*Id.* at 32-33).  ALJ Walsh found that "what that essentially means is that even though [Plaintiff] was working only 32 hours a week, he was lifting weight well above 10 pounds at the sedentary level."  (*Id.*).

Plaintiff explained that this was an error, and that the form was not filled out correctly because Plaintiff is "essentially illiterate." (SSA Rec. 33).  Plaintiff testified that "[he] can write, but not everything.  [He] didn't finish high school. [He] never wrote this." (*Id.* at 34).  Plaintiff explained that he did not complete

the form personally; it was filled out by "a lady" when he applied for benefits. (*Id.* at 35). Plaintiff never lifted the furniture himself; rather, he "just sat in the truck, ma[d]e sure [his employer] didn't get no tickets. [The employer] was the one delivering and lifting[.]" (*Id.* at 36). Plaintiff indicated that he would be happy to produce his former employer to testify to this fact in person. (*Id.* at 37).

ALJ Walsh then turned to the medical records provided by Metropolitan Hospital, which records also indicated that Plaintiff had described his employment as "unloading trucks." (SSA Rec. 40). Plaintiff's attorney explained that Plaintiff had consistently reported assisting with the unloading of trucks, and reasoned that "the process of delivering the furniture is also making sure that the truck doesn't get ticketed, doesn't get towed." (*Id.* at 43).

Given this ambiguity, ALJ Walsh asked Plaintiff to explain "in [his] own words exactly when [he] started working, what [his] duties were, who [he] worked for, and so forth." (SSA Rec. 44). Plaintiff responded that his job entailed,

> [s]itting down in a truck to make sure [his employer] wasn't getting no tickets. I said I helped him — like I felt like I was helping him, but I wasn't unloading trucks. I can't even carry a 100 pounds — I can carry less than 10 pounds. ... I never carry nothing. ... Because I can't, I'm disabled.

(*Id.* at 44-45). Regarding his ability to carry things, Plaintiff testified that he could lift "at this time, 15, 20, 30 pounds at most. Not more than that." (*Id.* at 45). This testimony, ALJ Walsh concluded, mooted the problem posed by the

21

ambiguity of Plaintiff's work history form and medical records.  (*Id.* at 49).

Plaintiff clarified, however, that he could not "lift 10 pounds two hours a day."

(*Id.* at 51).

## D.   ALJ Walsh's Opinion Denying Benefits

On March 28, 2014, ALJ Walsh issued a decision denying Plaintiff's

applications for DIB and SSI benefits.  (SSA Rec. 9-23).  As a threshold matter,

ALJ Walsh found that Plaintiff had met "the insured status requirements of the

Social Security Act through December 31, 2011."  (*Id.* at 14).  Thus, Plaintiff

was required to "establish disability on or before that date in order to be

entitled to a period of disability and disability insurance benefits."  (*Id.* at 12).

To determine whether Plaintiff was disabled, ALJ Walsh applied the

familiar five-step analysis that the Social Security Act, *see* 20 C.F.R. § 416.920,

requires.  (SSA Rec. 14-23).[9]  Starting at the first step, ALJ Walsh determined

---

9       The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (per curiam) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d. Cir. 2005).

that Plaintiff had "not engaged in substantial gainful activity since December 2, 2006, the alleged onset date." (*Id.* at 14).  Though Plaintiff had worked for various periods of time in 2011 and 2012, his earnings were "below monthly substantial gainful activity levels." (*Id.*).

At step two, ALJ Walsh found that Plaintiff suffered from several physical impairments that qualified as "severe" under the Social Security Regulations ("SSRs"), satisfying "the *de minimis* threshold of severity and caus[ing] more than minimal functional limitations to [Plaintiff's] ability to perform basic work activities." (SSA Rec. 15).  Specifically, ALJ Walsh found Plaintiff's "severe" impairments to include his "status post left calcaneus fracture, history of right wrist injury, history of right ankle trauma[,] and asthma." (*Id.* at 14 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c))).

By contrast, ALJ Walsh found that Plaintiff's "medically determinable mental impairment of adjustment disorder" was not severe, because it did not cause "more than minimal limitation in [his] ability to perform basic mental work activities." (SSA Rec. 15).  To make this finding, ALJ Walsh evaluated Plaintiff with regard to the "four broad functional areas ... known as the 'paragraph B' criteria." (*Id.*).  First, ALJ Walsh determined that Plaintiff's mental impairment did not limit his ability to perform activities of daily living; any alleged impairments in this area were attributable only to Plaintiff's physical condition. (*Id.*).  Second, ALJ Walsh found that Plaintiff's social functioning was only mildly limited; Plaintiff did not frequently socialize, but he did socialize with his wife and child, made good eye contact, was well-groomed,

23

was able to relate adequately to others, and could travel independently using public transportation.  (*Id.*).  Third, ALJ Walsh identified no limitations with regard to Plaintiff's concentration, persistence, or pace.  (*Id.*).  ALJ Walsh considered the "two mental status examinations of record," both of which "documented that [Plaintiff's] cognitive functions and attention and concentration was intact."  (*Id.*).  Fourth, ALJ Walsh determined that Plaintiff had experienced no episodes of decompensation of an extended duration.  (*Id.*).  "Because [Plaintiff's] medically determinable mental impairment causes no more than 'mild' limitation in any of the first three functional areas, and 'no' episodes of decompensation which have been of extended duration in the fourth area," ALJ Walsh concluded that "it is nonsevere."  (*Id.* (citing 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1))).

This severity finding was confirmed, ALJ Walsh continued, by the "dearth of medical evidence" in the record.  (SSA Rec. 16).  ALJ Walsh explained that there was no evidence in the record that Plaintiff "received ongoing mental health treatment or that he took any psychotropic medications" in the seven years since the alleged onset of his mental impairment.  (*Id.*).  ALJ Walsh noted and described two occasions on which Plaintiff reported mental health symptoms to an emergency room, in April 2009 and August 2011.  (*Id.*).  In each case, Plaintiff reported external stressors like family and legal issues and the stress of living in a shelter.  (*Id.*).  In 2009, Plaintiff was diagnosed with an anxiety attack, but there was no evidence that he needed medication or follow-up care.  (*Id.*).  In 2011, Plaintiff presented with a dysphoric mood but

24

otherwise normal mental status.  (*Id.*).  He "was assessed with adjustment disorder with mixed emotions" and given a global assessment of functioning ("GAF") score of 60, which is "indicative of moderate symptoms," but ALJ Walsh accorded this score little weight.  (*Id.*).[10]  ALJ Walsh explained that the GAF score "is a very subjective measure of functioning," which at best "is germane only to [Plaintiff's] functioning at [a] precise time, and not to the overall period of alleged disability."  (*Id.*).  Considering the score in the context of the record as a whole, which "lack[ed] evidence of ongoing treatment," ALJ Walsh concluded that Plaintiff's "general functioning was not as impaired as this GAF score implies."  (*Id.*).

By contrast, ALJ Walsh accorded significant weight to the opinion of Arlene Broska, Ph.D., who performed a psychiatric consultative examination of Plaintiff in May 2012.  (SSA Rec. 16-17).  Dr. Broska credited Plaintiff's self-report that he was not receiving mental health treatment and documented all normal findings.  (*Id.* at 16).  ALJ Walsh deemed Dr. Broska's opinion consistent with the record as a whole and found that it fully supported the ALJ's finding that Plaintiff had no severe medically determinable impairment.  (*Id.* at 17).

ALJ Walsh thus turned to step three, but only with regard to Plaintiff's severe physical impairments.  (SSA Rec. 17).  ALJ Walsh found Plaintiff did not

---

10      As this Court noted previously, "the utility of this metric is debatable, particularly after its exclusion from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders."  *Otanez* v. *Colvin*, No. 14 Civ. 8184 (KPF), 2016 WL 128215, at *12 n.8 (S.D.N.Y. Jan. 12, 2016) (collecting cases).

have an impairment or combination of impairments that met or medically equaled the severity of the impairments listed in Appendix 1; the medical evidence in the record did not "substantiate listing-level severity of [Plaintiff's] impairment, and no acceptable medical source ... mentioned findings equivalent in severity to the criteria of any listed impairments." (*Id.*).

At step four, to determine Plaintiff's residual functional capacity ("RFC"), ALJ Walsh first considered Plaintiff's symptoms, "and the extent to which [they could] reasonably be accepted as consistent with the objective medical evidence and other evidence." (SSA Rec. 17). "After careful consideration of the evidence," ALJ Walsh found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] ... [Plaintiff's] statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely credible." (*Id.* at 18). Plaintiff alleged that his disability began in December 2006, but provided no medical evidence before June 2008, when Plaintiff had a left calcaneal fracture in his left ankle (*id.*), a "relatively minor injury." (*Id.* at 21). Following the treatment and continued healing of the fracture, no further physical complaints were documented until April 2012, when Plaintiff reported to the emergency room with left limb pain. (*Id.* at 18). No further fracture was found, so Plaintiff was discharged and directed to take acetaminophen and Naproxen. (*Id.*). Plaintiff returned to the emergency room one month later with similar complaints, at which time he was assessed with posttraumatic arthritis and given a steroid injection. (*Id.*). Upon a third emergency room visit in December 2013, Plaintiff

26

was discharged without examination and advised to take Motrin.  (*Id.* at 18-19).
Though the record reflects some referrals — to physical therapy, an orthotic
clinic, a podiatrist, rehabilitation at North Central Bronx Hospital, and for an
anesthesia and pain management consult — the ALJ found there were no
records of any treatment.  (*Id.* at 19).  ALJ Walsh noted that while a single
January 2014 record from Mt. Sinai Hospital documented an asthma flare-up
and prescriptions for Albuterol and Prednisone, there was "no evidence of
persistent, intrusive[,] or frequent asthma attacks."  (*Id.* at 19-20).

ALJ Walsh also considered opinion evidence as required by 20 C.F.R.
§§ 404.1527 and 416.927 and the relevant SSRs.  (SSA Rec. 17).  First, ALJ
Walsh considered the opinion of PA Marsigliano and accorded it little weight.
(*Id.* at 19).  ALJ Walsh explained that he did so because (i) "the record
contain[ed] no treatment notes from Ms. Marsigliano that support her many
opined limitations," nor documentation of any office visits; (ii) Ms. Marsigliano
did not cite to any objective physical examination findings in her opinion
statement; and (iii) the other evidence of record, specifically the consultative
examiner's opinion and Plaintiff's statements, did not support her opinion.
(*Id.*).

By contrast, ALJ Walsh accorded significant weight to the opinion of
Dr. Marilee Mescon, who performed a consultative physical examination of
Plaintiff in May 2012.  (SSA Rec. 20).  Dr. Mescon conducted what ALJ Walsh
deemed to be a comprehensive physical examination, and she "diagnosed
[Plaintiff] with [a] history of right wrist injury with restriction of range of

27

motion, history of bilateral ankle trauma, asthma[,] and marijuana use." (*Id.*).
She found no limitations in Plaintiff's abilities to sit or stand but determined
that Plaintiff's ability to climb, push, pull, and carry heavy objects was
moderately to severely limited.  (*Id.*).  Because of Plaintiff's history of asthma,
Dr. Mescon advised the avoidance of toxic dust, chemicals, and fumes.  (*Id.*).
ALJ Walsh determined that these "opined limitations were consistent with the
clinical findings documented in [Dr. Mescon's] examination record," and fully
accommodated by sedentary work.  (*Id.*).

ALJ Walsh also evaluated the consistency of Plaintiff's allegations with
his behavior and testimony.  (SSA Rec. 20-21).  ALJ Walsh found that "the
record reflects that [Plaintiff] worked doing physical labor since the alleged
onset date," which was "wholly incongruent with his allegations."  (*Id.* at 20).
Two independent sources documented Plaintiff's performance of work that
involved moving furniture.  (*Id.* at 20-21).  Though Plaintiff denied at his last
hearing that he did such work, Plaintiff indicated on his work history report
that he assisted a driver making furniture deliveries in 2011 and 2012, which
involved the frequent lifting of 50 or more pounds and occasional lifting of 100
or more pounds.  (*Id.* at 21).  ALJ Walsh found this activity to "significantly
diminish[] [Plaintiff's] overall credibility regarding the severity of his
impairments."  (*Id.*).  Plaintiff's "contradictory testimony strongly diminishe[d]
his overall persuasiveness and [his] work history indicate[d] that his reported
symptoms might not have been [as] severe as alleged."  (*Id.*).  ALJ Walsh also
found that the lack of evidence of "any long-term ongoing treatment," and

Plaintiff's self-reported medication with Naproxen, an over-the-counter medication that diminished his pain for five hours, was a "highly conservative level of treatment … incongruent with allegations of disability." (*Id.*).

Considering all the evidence as a whole, ALJ Walsh determined that Plaintiff had

> the residual functional capacity to perform the full range of sedentary work as defined in [20 C.F.R. §§ 404.1567(a) and 416.967(a)] with an additional environmental limitation. [Plaintiff was] capable of lifting/carrying a maximum of ten pounds at a time, and sitting for approximately six hours and standing/walking for approximately two hours in an eight-hour workday. [Plaintiff's] work environment [had to] be free of excessive amounts of respiratory irritants.

(SSA Rec. 17). ALJ Walsh noted that he found this RFC "[d]espite the fact that [Plaintiff's] work history indicates that his abilities far exceed his allegations, in accommodation of the opinion of Dr. Antiaris[11] and taking into account [Plaintiff's] subjective complaints that are consistent with the medical evidence." (*Id.* at 21). Given this RFC, ALJ Walsh determined that Plaintiff was unable to perform his past relevant work as a mail clerk, because that work required a light level of exertional activity and Plaintiff was limited to performing work at a sedentary level. (*Id.* at 22).

ALJ Walsh thus considered, at step five, whether there was other work that Plaintiff could perform, and found that there was. (SSA Rec. 22). As a preliminary matter, ALJ Walsh considered Plaintiff's age, education, and work

---

[11] After reviewing the totality of the ALJ's decision, the Court understands the reference to Dr. Antiaris to be a typographical error, and that ALJ Walsh was in fact referring to PA Marsigliano.

experience and determined that Plaintiff was 37 at the alleged onset date,[12] had

a limited education, and could communicate in English.  (*Id.* (citing 20 C.F.R.

§§ 404.1563, 404.1564, 416.963, and 416.964)).  If Plaintiff had only the

residual functional capacity to perform a full range of sedentary work, without

the additional environmental limitation, ALJ Walsh determined that "a finding

of 'not disabled' would be directed by Medical-Vocational Rule 201.25."  (*Id.*).

Because "most job environments do not involve great noise, amounts of dust,

etc.," and Plaintiff's "medical restriction to avoid excessive exposure to an

environmental condition" would therefore "ha[v]e only a slight effect on the

occupational base of work," if any, ALJ Walsh reasoned that a finding of "not

disabled" was still appropriate.  (*Id.* at 23).

Accordingly, ALJ Walsh determined that Plaintiff had not been under a

disability, as defined by the Social Security Act, from the date of alleged onset

through the date of decision.  (SSA Rec. 23).  Plaintiff's applications for DIB

and SSI were denied.  (*Id.*).

## E.   Plaintiff's Appeal and the Instant Litigation

Plaintiff was provided with written notice of ALJ Walsh's decision, and

timely requested that the Appeals Council reconsider it.  (*See* SSA Rec. 7-23;

---

[12]   Plaintiff testified at one administrative hearing that he was then 34.  (SSA Rec. 70).  The
parties agree, however, that Plaintiff was 37 at the date of the alleged onset of his
disability.  (Def. Br. 2; Pl. Br. 2).  Ultimately, the discrepancy is irrelevant because
Plaintiff, at either age, is a "younger individual" for the purposes of ALJ Walsh's
analysis, and the ALJ considered him as such.  (SSA Rec. 22 (citing 20 C.F.R.
§§ 404.1563 and 416.963)).

*see also id.* at 312-19).  On April 24, 2015, the Appeals Council denied

Plaintiff's request.  (*Id.* at 1-4).  The instant appeal followed.

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings

are closed — but early enough not to delay trial — a party may move for

judgment on the pleadings."  Fed R. Civ. P. 12(c); *see generally Greek* v. *Colvin*,

802 F.3d 370, 374 (2d Cir. 2015) (per curiam) (evaluating a district court's

grant of motion for judgment on the pleadings in the context of an SSA appeal).

To evaluate a motion for judgment on the pleadings, a court applies the same

standard as that applied to a motion to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir.

1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir.

2011).  Specifically, a court must "draw all reasonable inferences in Plaintiff['s]

favor, 'assume all well-pleaded factual allegations to be true, and determine

whether they plausibly give rise to an entitlement to relief.'"  *Faber* v. *Metro. Life

Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway

Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if he

alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell

Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator

Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) ("While *Twombly*

does not require heightened fact pleading of specifics, it does require enough

31

facts to [have nudged Plaintiff's] claims across the line from conceivable to plausible." (internal quotation mark omitted) (quoting *Twombly*, 550 U.S. at 570)).

### 2. Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate his "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also id.* § 423(a)(1)(A); 20 C.F.R. § 416.202 (outlining SSI qualifications); 20 C.F.R. § 416.905 (using DIB definition of "disability" to define "disability" for SSI purposes); *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005). The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Furthermore, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard.  *Selian* v. *Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (internal quotation marks omitted) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012))).  Where the findings of the SSA are supported by substantial evidence, those findings are "conclusive."  *See, e.g.*, *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) (citing 42 U.S.C. § 405(g)).

"'Substantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential standard of review — even more so than the 'clearly erroneous' standard." *Brault* v. *Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  To make the determination of whether the agency's findings were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Talavera*, 697 F.3d at 151 (internal quotation marks omitted) (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

**B.     Analysis**

**1.     Overview of the Parties' Arguments**

On January 27, 2016, Defendant moved for judgment on the pleadings, arguing that ALJ Walsh's decision should be affirmed because (i) the decision was supported by substantial evidence; (ii) ALJ Walsh properly assessed Plaintiff's credibility; and (iii) substantial evidence supported ALJ Walsh's finding that Plaintiff was capable of performing jobs that exist in significant numbers in the national economy. (Def. Br. 16-25). On March 14, 2016, Plaintiff filed his cross-motion for judgment on the pleadings and opposition to Defendant's motion. (Pl. Br.). Plaintiff argued that ALJ Walsh's decision was improper because (i) ALJ Walsh failed to weigh properly the opinion of PA Marsigliano; (ii) ALJ Walsh erroneously gave controlling weight to the opinions offered by non-treating medical sources Dr. Mescon, Dr. Broska, and Dr. Inman-Dundon; (iii) ALJ Walsh's credibility finding was not supported by substantial evidence; (iv) ALJ Walsh failed to conduct a full and fair hearing on a fully developed record; (v) ALJ Walsh improperly relied on the Social Security Administration's Medical Vocational Guidelines (the "Grids") at step five, in failing to call a vocational expert ("VE"); and (vi) ALJ Walsh failed to consider the combined effect of Plaintiff's medical conditions. (*Id.* at 13-25).

Defendant filed her response in further support of her motion and in opposition to Plaintiff's on April 5, 2016. (Def. Reply). Defendant argued that ALJ Walsh had properly weighed all of the medical opinion evidence, evaluated Plaintiff's credibility, and considered the combined effect of Plaintiff's

impairments.  (*Id.* at 1-6, 10).  Defendant denied that ALJ Walsh had failed to develop the record because there were no gaps in the record that ALJ Walsh should have filled and ALJ Walsh did not need an additional hearing to consider testimony from Plaintiff's employer.  (*Id.* at 7-9).  Finally, Defendant argued that ALJ Walsh did not err in relying only on the Grids and not consulting a VE at step five.  (*Id.* at 9-10).[13]  Plaintiff filed his reply on April 26, 2016, in which he reiterated the arguments made in his initial motion.  (*See* Pl. Reply).

### 2.     The Weight of Opinion Evidence

#### a.     Applicable Law

The treating physician rule establishes that the opinion of a claimant's treating physician is entitled to "controlling weight" as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," *Burgess* v. *Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (internal quotation marks omitted) (quoting 20 C.F.R.

---

[13]     Defendant further noted that Plaintiff did not challenge the ALJ's finding with regard to Plaintiff's alleged severe mental impairment in his Complaint.  (Def. Br. 18 n.11; Def. Reply 4 n.4).  Because, generally, Plaintiffs may not advance new claims for the first time in opposition to motions for judgment on the pleadings, Defendant first argued that this claim was waived.  (Def. Reply 4 n.4 (citing *Henry* v. *Dow Jones*, No. 08 Civ. 5316 (NRB), 2009 WL 210680, at *4 n.5 (S.D.N.Y. Jan. 28, 2009)).  Even if it were not waived, Defendant continued, the ALJ's finding that Plaintiff had no severe mental impairment was supported by substantial evidence.  (Def. Br. 18 n.11; Def. Reply 4 n.4).  The Court agrees that Plaintiff has not specifically argued against the ALJ's finding that Plaintiff did not suffer from a severe mental impairment.  However, Plaintiff has disputed the weight given to the opinions that supported that finding, and has argued that the ALJ failed to account for the combination of Plaintiff's physical and mental impairments.  While a specific argument regarding the ALJ's analysis of Plaintiff's mental impairment may have been waived, these other arguments have not been, and this Court will address them in turn below.

§ 404.1527(d)(2)), including "opinions of other medical experts," *Petrie* v. *Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) (quoting *Halloran* v. *Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)).  However, only acceptable medical sources can be considered treating sources.  *See, e.g.*, *Genier* v. *Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (summary order) (quoting Social Security Ruling 06-3p).  Acceptable medical sources include physicians, psychologists, and podiatrists, but do not include medical professionals like nurse practitioners or physician assistants.  *Id.*  The latter are considered "other sources" to whose opinions controlling weight is not owed.  *Id.*

If an opinion is not a treating physician's opinion that is entitled to controlling weight, the ALJ must determine what weight it is owed as required by the regulations.  20 C.F.R. § 404.1527(c); *id.* § 416.927(c).  Specifically, the ALJ must consider (i) the evidentiary supportability of the opinion; (ii) the consistency of the opinion with the entirety of the record; (iii) the specialty of the treating professional; (iv) the duration, nature, and extent of the relationship between the treating professional and the claimant; and (v) any other relevant factors.  *Id.*; *see also, e.g.*, *Heagney-O'Hara* v. *Comm'r of Soc. Sec.*, 646 F. App'x 123, 126 (2d Cir. 2016) (summary order); *Suttles* v. *Colvin*, No. 15-3803, 2016 WL 3573468, at *1 (2d Cir. June 30, 2016) (summary order).  An ALJ need not walk through each relevant factor "mechanically," *McGann* v. *Colvin*, No. 14 Civ. 1585 (KPF), 2015 WL 5098107, at *12 (S.D.N.Y. Aug. 31, 2015), but is nonetheless obligated to provide "good reasons" for his

deference determination, *see* 20 C.F.R. § 404.1527(c)(2).  *Accord Atwater* v.
*Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); *Halloran*, 362 F.3d
at 32-33.

###     b.     ALJ Walsh Appropriately Weighed the Opinion Evidence of PA Marsigliano

The parties agree that PA Marsigliano is not an "acceptable medical
source," as defined by Social Security Ruling 06-03p, but is rather an "other
source," to whose opinion controlling weight is not owed.  (Def. Br. 20-21
(quoting *Genier*, 298 F. App'x at 108); Pl. Br. 13-14).  Here, ALJ Walsh properly
considered the requisite factors to determine what weight her opinion merited.
ALJ Walsh found that the record lacked "treating records or any
documentation of any office visits."  (SSA Rec. 19).  He also found that PA
Marsigliano's opinion was not supported by the evidence that was in the
record; neither "the only comprehensive musculoskeletal examination in the
record" nor Plaintiff's own testimony "support[ed] the extreme limitations
opined by Ms. Marsigliano."  (*Id.*).  ALJ Walsh noted that PA Marsigliano was a
physician assistant at North Central Bronx Hospital.  (*Id.*).  He described her
two letters regarding her treatment of Plaintiff, which he noted were submitted
without supporting treatment notes.  (*Id.*).  PA Marsigliano claimed that she
had a treating relationship with Plaintiff, but ALJ Walsh found that this was
not supported by the record, which contained "no evidence of any ongoing
treatment."  (*Id.*).  ALJ Walsh therefore concluded properly that the opinion of
PA Marsigliano deserved little weight.

### c.   ALJ Walsh Appropriately Weighed the Consultative Opinions of Dr. Mescon and Dr. Broska

Conversely, Plaintiff argues that ALJ Walsh improperly "appear[ed] to give controlling weight" to the consultative opinions of Dr. Marilee Mescon and Dr. Arlene Broska. (Pl. Br. 17-18). The Court notes, as a preliminary matter, that these opinions were expressly given only "significant weight." (SSA Rec. 17, 20). Even "apparently," however, these opinions were not given controlling weight, but rather were given significant weight after a proper consideration of the regulatory factors. ALJ Walsh considered each opinion in the context of the record as a whole: Dr. Mescon's "opined limitations were consistent with the clinical findings documented in her examination report," as well as with Plaintiff's capacity as demonstrated by his performance of physical labor and testimony regarding his physical abilities. (*Id.* at 20-22). Dr. Broska's opinion was likewise "consistent with the examination record," and with the "dearth of medical" evidence regarding any allegedly severe mental impairment. (*Id.* at 17). ALJ Walsh noted that Dr. Broska is a psychiatric consultant with a Ph.D., and that Dr. Mescon is a Medical Doctor. (*Id.* at 16, 20). ALJ Walsh therefore concluded that the opinion of each of these doctors deserved significant weight, and he utilized them accordingly as non-controlling but important pieces of evidence among all the evidence in the record as a whole.

### d.   ALJ Walsh Appropriately Utilized the Consultative Opinion of Dr. Inman-Dundon

Plaintiff additionally argues that ALJ Walsh improperly appeared to give controlling weight to the opinion of Dr. Tammy Inman-Dundon, while also failing to designate specifically what weight he was giving to her opinion.  (Pl. Br. 18).  The Court disagrees.  The opinion of Dr. Inman-Dundon is relevant, and was properly considered, in two ways.  First, Dr. Inman-Dundon performed and documented the psychiatric technique as required by the relevant regulations.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  She found that Plaintiff had a medically determinable impairment, based on the records of his treatment at Metropolitan Hospital "as well as current evidence."  (SSA Rec. 98).  She then rated the degree of Plaintiff's functional limitations in four functional areas on a five-point scale: Plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social function; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration.  (*Id.* at 85, 98).  Dr. Inman-Dundon concluded, as the regulations provide, that Plaintiff's psychiatric impairment was nonsevere.  (*Id.* at 98; *see also* 20 C.F.R. §§ 404.1520a(d), 416.920a(d)).

ALJ Walsh then utilized Dr. Inman-Dundon's opinion in his own application of the psychiatric review technique.  The regulations require that ALJ Walsh's written decision "must incorporate the pertinent findings and conclusions based on the technique"; "must show the significant history, including examination and laboratory findings, and the functional limitations

39

that were considered in reaching a conclusion about the severity of the mental impairment(s)"; and "must include a specific finding as to the degree of limitation in each of the [four] functional areas." 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).  ALJ Walsh's opinion did so.  ALJ Walsh walked through each of the four functional areas and identified the degree of limitation.  (SSA Rec. 15).  ALJ Walsh also discussed the records of the two hospital visits at which Plaintiff reported mental health symptoms, and the psychiatric consultative examination performed by Dr. Broska.  (*Id.* at 15-17).  ALJ Walsh therefore properly discharged his obligations with regard to the psychiatric technique.

Second, the Court notes that because Dr. Inman-Dundon is a state agency medical consultant, her opinion may be considered as opinion evidence. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).  As such, it is evidence to which ALJ Walsh should have assigned a specific weight.  However, ALJ Walsh's failure to assign a specific weight to Dr. Inman-Dundon's opinion was at most harmless. *Cf. Zabala* v. *Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (explaining that ALJ's failure to consider even a treating physician's report could be harmless error if there was "no reasonable likelihood" that considering it would have changed the disability determination").  ALJ Walsh himself replicated her analysis as aforementioned, applying the requisite psychiatric review technique as aforementioned, and reached his own conclusion regarding Plaintiff's psychological impairments.  (SSA Rec. 15-17).  It is thus evident to the Court that Dr. Inman-Dundon's opinion was incorporated in ALJ Walsh's opinion as

a piece of substantial evidence.  *See Cichocki* v. *Astrue*, 729 F.3d 172, 178 n.3
(2d Cir. 2013) (per curiam) ("An ALJ need not recite every piece of evidence that
contributed to the decision, so long as the record 'permits us to glean the
rationale of an ALJ's decision'" (quoting *Mongeur*, 722 F.2d at 1040)).

### 3.   Credibility Determinations

#### a.   Applicable Law

An ALJ "is required to take the claimant's reports of pain and other
limitations into account" when assessing a claimant's RFC, *Genier* v. *Astrue*,
606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citing 20 C.F.R. § 416.929),
though statements about "pain or other symptoms will not alone establish" a
disability, 20 C.F.R. § 404.1529(a); *id.* § 416.929(a).  An ALJ has discretion to
reject a claimant's subjective complaints, *e.g.*, *Cohen* v. *Comm'r of Soc. Sec.*,
643 F. App'x 51, 53 (2d Cir. 2016) (summary order), but he can only do so
pursuant to the two-step process required by the relevant regulations, 20
C.F.R. § 404.1529(a) and § 416.929(a).  "At the first step, the ALJ must decide
whether the claimant suffers from a medically determinable impairment that
could reasonably be expected to produce the symptoms alleged."  *Genier*, 606
F.3d at 49 (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from
such an impairment, at the second step, the ALJ must consider 'the extent to
which [the claimant's] symptoms can reasonably be accepted as consistent
with the objective medical evidence and other evidence' of record."  *Id.*
(alteration in original) (quoting 20 C.F.R. § 404.1529(a)).

If a claimant's alleged symptoms "are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors* v. *Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (summary order).  This credibility inquiry

> implicates seven factors to be considered, including: [i] the claimant's daily activities; [ii] the location, duration, frequency, and intensity of the pain; [iii] precipitating and aggravating factors; [iv] the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; [v] any treatment, other than medication, that the claimant has received; [vi] any other measures that the claimant employs to relieve the pain; and [vii] other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

*Id.* at 184 n.1 (citing 20 C.F.R. § 404.1529(c)(3)).  The ALJ's ultimate credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight." *Cichocki* v. *Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order) (quoting SSR 96-7p, 1996 WL 374186, at *2); *see also Williams ex rel. Williams* v. *Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing *Carroll* v. *Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)).  However, though the ALJ must do more than "make a single, conclusory statement that the claimant is not credible or simply ... recite the relevant factors," *Cichocki*, 534 F. App'x at 76 (quoting SSR 96-7p, 1996 WL 374186, at *2) (internal quotation mark omitted), remand is not required where "the record 'permits us to glean the

rationale of an ALJ's decision,'" *Cichocki*, 729 F.3d at 172 n.3 (quoting *Mongeur*, 722 F.2d at 1040). Furthermore, "[w]here supported by specific reasons, 'an ALJ's credibility determination is generally entitled to deference on appeal.'" *Evans* v. *Colvin*, 649 F. App'x 35, 39 (2d Cir. 2016) (summary order) (quoting *Selian*, 708 F.3d at 420).

### b. ALJ Walsh Properly Evaluated Plaintiff's Credibility

After recounting the requisite steps of the credibility inquiry, ALJ Walsh properly proceeded through them. First, ALJ Walsh determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms." (SSA Rec. 18). Second, ALJ Walsh determined that Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of [his] symptoms [were] not entirely credible." (*Id.*). ALJ Walsh provided sufficiently specific reasons for this second conclusion that were based on the evidence in the record. He considered Plaintiff's daily activities, as described in Plaintiff's activities of daily living report. (*Id.*). He considered the records of Plaintiff's various medical treatments, and Plaintiff's description of his pain. (*Id.* at 18-22). ALJ Walsh noted that Plaintiff received a "highly conservative level of treatment," and treated his pain primarily with over-the-counter medications. (*Id.* at 21). Plaintiff was referred for other consultations, but ALJ Walsh found no treating records of these appointments. (*Id.* at 19). ALJ Walsh also considered Plaintiff's apparent performance of physical labor, which he found "wholly incongruent" with Plaintiff's allegations. (*Id.* at 20).

Plaintiff disagrees with ALJ Walsh's consideration of this last factor, arguing that "ALJ Walsh was mainly interested in determining that Plaintiff had lifted heavy furniture," and did not fully consider the other factors. (Pl. Br. 21). The Court disagrees. ALJ Walsh considered all of the factors as he was required to. He acknowledged the ambiguity regarding Plaintiff's "assistance" with furniture delivery, and took "into account the claimant's subjective complaints that are consistent with the medical evidence." (SSA Rec. 21). Ultimately, though Plaintiff may not agree with ALJ Walsh's credibility conclusion, it was supported by substantial evidence.

### 4.     The Duty to Develop the Record

#### a.     Applicable Law

The presiding ALJ has an affirmative obligation to develop the administrative record. *See, e.g.*, *Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009); *Perez* v. *Chater*, 77 F.3d 41, 47 (2d Cir. 1996); *see generally Sims* v. *Apfel*, 530 U.S. 103, 111 (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, and exists even when ... the claimant is represented by counsel." *Pratts* v. *Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal citation omitted). The ALJ must "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" a determination as to the

claimant's disability.  42 U.S.C. § 423(d)(5)(B); *see also* 20 C.F.R.

§ 404.1512(d)-(e); *id.* § 416.912(d)-(e).

### b.    ALJ Walsh Discharged His Duty to Develop the Record

Plaintiff is correct that ALJ Walsh's opinion highlights the absence of

relevant medical records at several points.  (SSA Rec. 18-22).  Plaintiff is

incorrect, however, in asserting that the absence of these records results from

any failure of ALJ Walsh to procure them.  ALJ Walsh procured records from

all of the medical facilities and physicians that Plaintiff identified in his benefits

applications.  (*See id.* 305, 473).  ALJ Walsh considered these records

throughout his opinion.  (*Id.* at 14-22).  He noted that while Plaintiff presented

with some regularity to emergency rooms with complaints of injuries or pain,

Plaintiff apparently received no ongoing treatment.  (*Id.*).  ALJ Walsh discussed

the various referrals that Plaintiff received upon these visits, and in each case

determined that there were no records of subsequent treatment.  (*Id.* at 19).

Because ALJ Walsh requested relevant records broadly, from the date of onset

through the date of decision, and was provided records spanning that period,

though with noticeable gaps, ALJ Walsh fairly concluded that the gaps were the

result of gaps in treatment.  (*See id.* at 434 (requesting all records related to

Plaintiff's asthma and ankle, leg, wrists, face, and thigh problems maintained

by North Central Bronx Hospital beginning on December 1, 2005)).  This

conclusion was all the more reasonable given Plaintiff's failure to identify other

treating physicians from whom any missing records ought to be procured.

It is possible that ALJ Walsh could have followed up with PA Marsigliano, Plaintiff's physical therapist, and the various departments to which Plaintiff was referred for consultations and obtained further treatment notes. Where an ALJ reasonably believes that he possesses a complete medical history, however, he "is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa* v. *Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999). Here, ALJ Walsh reasonably believed just that. The letters from PA Marsigliano supported ALJ Walsh's ultimate finding that Plaintiff could perform sedentary work. Having considered them, ALJ Walsh "had no further obligation to obtain additional information." *Perez*, 77 F.3d at 47-48 (finding that the ALJ satisfied his duty to develop the record when the ALJ considered the treating physician's report and it accorded with the ALJ's ultimate determination). ALJ Walsh perhaps overstated the absence of referral treatment records, given that there is evidence that Plaintiff visited orthopedics, podiatry, and rehabilitation and was at some point prescribed the cane that he used to ambulate. (SSA Rec. 307, 483-87, 536). However, there is again nothing to indicate that these records in any way suggested that Plaintiff could not, as ALJ Walsh found, perform sedentary work. With regard to Plaintiff's cane, for example, ALJ Walsh expressly accounted for its use despite also noting the absence of any records outlining the reasons for its prescription, and he discussed its use with Plaintiff. (*Id.* at 20, 63). This is not a case, therefore, involving a clear gap or inconsistency in the record that additional records were required to fill. *See Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *see also* 20 C.F.R.

46

§ 404.1512(d)-(e); *id.* § 416.912(d)-(e).  ALJ Walsh had a complete medical history, and a fully developed record.

Plaintiff argues that ALJ Walsh should have held a fourth administrative hearing to solicit testimony from Plaintiff's employer, Luis Hernandez.  (Pl. Br. 22-23).  This, too, ALJ Walsh was not obligated to do.  Though ALJ Walsh noted an ambiguity in the record with regard to the amount of physical exertion that Plaintiff's employment with Mr. Hernandez entailed, ALJ Walsh ultimately resolved this ambiguity in Plaintiff's favor, based on Plaintiff's own testimony regarding his abilities and other substantial evidence.  (*See* SSA Rec. 20-22).  Specifically, ALJ Walsh found that Plaintiff could perform only sedentary work.  (*Id.*).  This finding would have been consistent with any possible testimony from Plaintiff's employer, whom Plaintiff indicated would testify that Plaintiff only sat in a delivery truck.  (*See id.* at 37).  ALJ Walsh was therefore not obligated to hold an additional hearing to supplement the already complete record.  *See Rosa*, 168 F.3d at 79 n.5; *Cichocki*, 534 F. App'x at 77.

### 5.    Identification of Available Work

#### a.    Applicable Law

When a claimant cannot perform his past relevant work, the Commissioner must determine that he "still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa*, 168 F.3d at 77 (internal quotation mark omitted) (quoting *Bapp* v. *Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).  In most cases, the Commissioner is able to make this determination by consulting with the

application Medical-Vocational Guidelines (the "Grids"),[14] which indicate

whether there are a sufficient number of jobs available in the national economy

for a person with a given claimant's RFC, age, education, and work experience

to perform. *Butts*, 388 F.3d at 383 (quoting *Rosa*, 168 F.3d at 78). The Grids

are not dispositive, however, in cases where a claimant's "exertional

impairments are compounded by significant nonexertional impairments that

limit the range of sedentary work that the claimant can perform." *Rosa*, 168

F.3d at 78 (quoting *Zorilla* v. *Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996)).[15]

Generally speaking, an "ALJ cannot rely on the Grids if a non-exertional

impairment has any more than a 'negligible' impact on a claimant's ability to

perform the full range of work, and instead must obtain the testimony of a

vocational expert." *Selian*, 708 F.3d at 421. "A nonexertional impairment is

non-negligible 'when it ... so narrows a claimant's possible range of work as to

deprive him of a meaningful employment opportunity.'" *Id.* (omission in

original) (quoting *Zabala,* 595 F.3d at 411).

---

[14]   The Medical-Vocational Guidelines are a set of three tables found at 20 C.F.R. § 404, Subpart P, Appendix 2. Once a claimant's age, education, RFC, and work experience have been determined, the tables can be used to make a determination of "disabled" or "not disabled."

[15]   Exertional impairments are those that affect a person's ability to meet the strength demands of jobs, like sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). Non-exertional impairments are those that affect a person's ability to meet the other demands of jobs. *Id.* §§ 404.1569a(c), 416.969a(c).

### b.    ALJ Walsh Properly Utilized the Grids at Step Five

Plaintiff alleges that ALJ Walsh's reliance on the Grids was improper because Plaintiff had a number of "non-exertional impairments that significantly limit the range of work permitted by his exertional limitations." (Pl. Br. 23).  Specifically, Plaintiff alleges that his lateral sensation loss; anxiety; insomnia; dizziness; and inability to stoop, bend, follow written instructions, remember simple frequencies, concentrate, balance, and reach overhead all constitute non-exertional limitations.  (*Id.* at 24).  Plaintiff relies on the letters submitted by PA Marsigliano as his primary evidence of these limitations.  (*Id.*). As aforementioned, however, ALJ Walsh properly gave these letters little weight.  He found, considering the evidence contained in the record as a whole, that Plaintiff did not have the non-exertional limitations he alleged.  (SSA Rec. 17-22).  This finding was based on substantial evidence; specifically, ALJ Walsh considered Plaintiff's testimony, the consultative examination of Dr. Mescon, Plaintiff's daily activities, Plaintiff's work history, and the absence of any medical records supporting PA Marsigliano's claims.  *See Diaz*, 59 F.3d at 315 (citing *Dumas* v. *Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (affirming the evidentiary value of both what the record does and does not say)).

ALJ Walsh agreed with Plaintiff that Plaintiff did have one non-exertional limitation, which was imposed by Plaintiff's asthma.  (SSA Rec. 19-20; Pl. Br. 24-25).  Plaintiff contends that his asthma constituted a severe impairment, which would limit the jobs available to him.  ALJ Walsh disagreed, finding that the asthma limitation would have "little or no effect on the

occupational base of unskilled sedentary work." (SSA Rec. 22-23). Indeed, as ALJ Walsh noted, SSR 85-15 specifies that, "[w]here a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work [is] minimal because most job environments do not involve great noise, amounts of dust, etc." (*Id.* at 23 (quoting SSR 85-15)). Plaintiff's non-exertional limitation was therefore negligible, as it would not so narrow Plaintiff's possible range of work as to deprive him of a meaningful employment opportunity. Accordingly, ALJ Walsh did not need to consult a vocational examiner at step five and his reliance on the Grids was proper.

### 6. Consideration of the Combined Effect of Plaintiff's Impairments

In his final argument, Plaintiff contends that ALJ Walsh failed to consider "the combined effect of all of [Plaintiff's] physical and mental illnesses." (Pl. Br. 25). Plaintiff argues that ALJ Walsh's "decision relies almost entirely on limitations that Plaintiff has because of his exertional impairments." (*Id.*).

Plaintiff is correct that an ALJ is obligated to consider the combined effect of a claimant's conditions when making disability determinations. His contention that this ALJ failed to do so, however, is without merit. Throughout his opinion, ALJ Walsh evaluated and described Plaintiff's nonsevere mental and severe physical impairments, and the ways they allegedly combined to cause Plaintiff pain and compromise his functioning. (SSA Rec. 14-21). The ALJ's finding that Plaintiff's mental impairments were nonsevere "undermines the suggestions that the ALJ failed to consider this condition in concluding

[Plaintiff] did not suffer from multiple impairments that rendered [him] disabled." *Cichocki*, 729 F.3d at 178 n.3; *see also Brown* v. *Colvin*, 73 F. Supp. 3d 193, 200 (S.D.N.Y. 2014).  Though ALJ Walsh ultimately disagreed with Plaintiff with regard to the combined effect of these impairments, his decision was based on substantial evidence.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's motion for judgment on the pleadings is DENIED; the Defendant's motion for judgment on the pleadings is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:  November 16, 2016
      New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

51